947 F.Supp. 1344 (1996)
Robert L. BILTON, Plaintiff,
v.
MONSANTO COMPANY, Defendant.
No. 4:95CV798SNL.
United States District Court, E.D. Missouri, Eastern Division.
November 22, 1996.
Revised November 27, 1996 Nunc Pro Tunc.
*1345 *1346 Mary Anne O. Sedey, President, William E. Moench, Associate, Jon A. Ray, Mary Anne Sedey, P.C., St. Louis, MO, for plaintiff.
Clifford A. Godiner, Peper and Martin, St. Louis, MO, for defendant.

MEMORANDUM
LIMBAUGH, District Judge.
Plaintiff has filed a ten-count employment discrimination lawsuit regarding the termination of his employment in 1993. Plaintiff's claims are as follows: Count I  ADEA; Count II  Breach of employment contract; Count III  Breach of oral contract; Count IV  Breach of implied contract; Count V  Breach of covenant of good faith and fair dealing; Count VI  Fraudulent inducement to contract; Count VII  Fraudulent misrepresentation; Count VIII  Misrepresentation; Count IX  Quantum Meruit; and Count X  Bad faith.[1] This matter is before the Court on the defendant's motion for summary judgment[2] (# 42), filed June 11, 1996. Extensive responsive pleadings have now been filed. This case is set for trial on the Court's December 2, 1996 trial docket.
Courts have repeatedly recognized that summary judgment is a harsh remedy that should be granted only when the moving party has established his right to judgment with such clarity as not to give rise to controversy. New England Mut. Life Ins. Co. v. Null, 554 F.2d 896, 901 (8th Cir.1977). Summary judgment motions, however, "can be a tool of great utility in removing factually insubstantial cases from crowded dockets, freeing courts' trial time for those that really *1347 do raise genuine issues of material fact." Mt. Pleasant v. Associated Elec. Coop. Inc., 838 F.2d 268, 273 (8th Cir.1988).
Pursuant to Fed.R.Civ.P. 56(c), a district court may grant a motion for summary judgment if all of the information before the court demonstrates that "there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 467, 82 S.Ct. 486, 488, 7 L.Ed.2d 458 (1962). The burden is on the moving party. Mt. Pleasant, 838 F.2d at 273. After the moving party discharges this burden, the nonmoving party must do more than show that there is some doubt as to the facts. Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1355-56, 89 L.Ed.2d 538 (1986). Instead, the nonmoving party bears the burden of setting forth specific facts showing that there is sufficient evidence in its favor to allow a jury to return a verdict for it. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 2510-11, 91 L.Ed.2d 202 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).
In passing on a motion for summary judgment, the court must review the facts in a light most favorable to the party opposing the motion and give that party the benefit of any inferences that logically can be drawn from those facts. Buller v. Buechler, 706 F.2d 844, 846 (8th Cir.1983). The court is required to resolve all conflicts of evidence in favor of the nonmoving party. Robert Johnson Grain Co. v. Chem. Interchange Co., 541 F.2d 207, 210 (8th Cir.1976). With these principles in mind, the Court turns to an examination of the facts.
In 1993, defendant Monsanto Co. began a reorganization effort resulting in a reduction in force (RIF). This reorganization and RIF affected the Resins business unit, primarily located in Detroit, Michigan. In September 1993, plaintiff, a long-time employee of defendant, was the North America sales director for the Saflex Division of the Resins business unit. Plaintiff's office was in Detroit, Michigan.[3]
On September 28, 1993 plaintiff received a phone call from his supervisor, Gene Dejackome. John Roth, Monsanto's Director of Human Resources, was in the room with Dejackome when he placed the phone call to plaintiff. Roth did not participate in the phone call. Dejackome informed plaintiff that plaintiff's job was being eliminated as part of the reorganization and that plaintiff's employment with Monsanto would be terminated, effective December 31, 1993. Dejackome informed plaintiff that he had two options: one, he could accept early retirement pursuant to a special Voluntary Retirement Program (VRP) which provided enhanced retirement benefits; or two, he could reject the VRP and be involuntarily terminated with a less favorable severance package. Plaintiff voiced his objection to early retirement and asked about other opportunities for employment within the company. He was told that that wasn't an option. Plaintiff's deposition, pgs. 46-47. The conversation ended after plaintiff mentioned the possibility of litigation.
One of plaintiff's main concerns, upon being informed of his termination, was the effect of the termination on his stock options. Earlier that year, on or about February 26, 1993, plaintiff had been awarded a number of stock options by Monsanto pursuant to a company bonus plan. Plaintiff received 5300 options, 2000 of which were based on the company's annual performance, and the remaining 3300 as an incentive to reach a return on equity goal. The stock options agreement permitted plaintiff to purchase stock at a price of $51.188 per share when the options vested. According to the agreement, the stock options would vest one year from the grant date (that being, February 26, 1993). The stock options agreement also required that plaintiff be employed by Monsanto at the time of the vesting of his stock options, or if employment were terminated, that termination took place at least one year after the options were awarded. Plaintiff's Affidavit; Plaintiff's Exhibit 6. Consequently, plaintiff's termination date would preclude his ability to exercise his stock options.
*1348 On October 27, 1993 plaintiff received a package of documents outlining the VRP. Plaintiff's Affidavit; Plaintiff's deposition, pg. 50; Defendant's Exhibit 3. The VRP provided an enhanced retirement package; specifically, one year of severance pay and five (5) years of additional service credit under defendant's pension plan. The combined value of the VRP, to the plaintiff, was approximately $240,000.00. Affidavit of Mary Tonkin. In exchange for accepting the VRP's enhanced benefits, plaintiff was required to sign a waiver of any and all claims he may have against Monsanto relating to his termination (hereinafter referred to as simply "the release"). Defendant's Exhibit 3. Plaintiff had forty-five (45) days (up to and including December 13, 1993) to decide whether to accept the VRP. He had seven (7) days, after signing the agreement and release, to revoke his decision. Due to the nature of the documents involved, plaintiff was advised to consult with an attorney before making a decision about executing the documents.[4]
After the decision to eliminate plaintiff's position and terminate his employment as of December 31, 1993 was made and communicated to plaintiff, his name was placed in an "employee pool". Employees placed in the pool were those people throughout the company who were losing their jobs due to the RIF. Being placed in the "employee pool" enabled such an employee to be considered for employment in any position that might open up in the company. Deposition of John Ferguson, pgs. 50-53; Deposition of Gene Dejackome, pgs. 85-6; Deposition of John Roth, pgs. 109-10. John Ferguson, General Manager and Vice-President of Saflex, also asked his division managers, at a meeting, to consider Bilton for any position that might open up in their departments and for which he was qualified. Ferguson deposition, pg. 55.
In late November 1993, plaintiff traveled to St. Louis to speak with John Roth about his termination. He asked Roth to check and see if there were any positions available for him. He also asked Roth if he might be able to exercise his stock options prior to his termination. Finally, he asked Roth if he might be released from the non-compete clause in his Employment Contract. Plaintiff's Affidavit; Plaintiff's deposition, pgs. 52-3.
Approximately one week later, Roth called plaintiff. Roth informed plaintiff that John Ferguson, General Manager and Vice President of Saflex, had rejected all of plaintiff's requests. Plaintiff informed Roth, for the first time, that pursuant to his written Employment Contract, Monsanto had to give him 90 days written notice of termination of employment.[5] Plaintiff's Exhibit 1. Plaintiff believed that since timely written notice had not been given, he could not be terminated by Monsanto until the end of February 1994, at the earliest. Plaintiff stated that he would wait until February 1994, exercise his stock options, and take the regular severance package (which did not include a release of legal claims).
On or about December 2, 1993 Dejackome called plaintiff and told him that Ferguson wanted to meet with him the following day, over lunch, in St. Louis. Dejackome told plaintiff that Ferguson had a proposal he wanted to discuss with plaintiff. Plaintiff was in Phoenix, Arizona at the time; however, *1349 he managed to get a flight into St. Louis in time for the lunch meeting.
On December 3, 1993, over lunch, plaintiff met with John Ferguson and John Roth. Ferguson made a proposal to plaintiff regarding his early retirement package, specifically some type of consulting arrangement in lieu of the stock options. The exact details of this conversation and the numbers discussed are hotly contested by the parties. What is not disputed is that plaintiff wanted to see a written proposal for the consulting agreement before deciding whether to accept it. Plaintiff's deposition, pg. 60. Ferguson agreed to send him one.
On December 13, 1993 plaintiff signed the VRP documents, including the release. As of that date, plaintiff had not yet received the written proposal for the consulting agreement that Ferguson had agreed to send him. Prior to signing the release, plaintiff had discussed same with his attorney. In signing the release, plaintiff agreed that 1) he had "read and understood" the terms and conditions of the VRP documents, including the release; 2) that any questions he might have had "had been answered to [his] satisfaction"; 3) that he had been provided "reasonable time to consider [its] meaning and effect"; and 4) plaintiff was signing the release "of [his] own free will based only on the terms and conditions set out above." Defendant's Exhibit 3. At the time he signed the release, plaintiff understood he had seven (7) days in which to revoke his acceptance of the VRP. Plaintiff's deposition, pgs. 84-5.
On the evening of December 16, 1993, Roth faxed to plaintiff a written proposal for a consulting agreement. Plaintiff believed that the terms set out in the written proposal differed greatly from what he remembered being discussed at the lunch meeting on December 3, 1993. Plaintiff contacted his attorney to discuss the proposal.
On December 17, 1993 plaintiff e-mailed a response to Ferguson rejecting the written proposal. In his e-mail response, plaintiff stated:
I have reviewed the consulting document dated 12/13/93 that you sent to my attention. After discussing with my attorney, I am unable to accept your offer but want to express my appreciation for your efforts on my behalf. However, the consulting fee listed in your letter is vastly different from what I thought I heard during our luncheon meeting (it may have been I was suffering from jet lag and missed a point in your presentation). Additionally, the agreement severely restricts/eliminates my future options in seeking employment in the area of my expertise, which as you know is a very limited industry.
Defendant's Exhibit 6. A copy of this e-mail message was also delivered to Roth and Dejackome. Plaintiff also had a conversation with Dejackome regarding the written proposal. There is some dispute as to whether or not plaintiff actually showed the written proposal to Dejackome. According to the numbers plaintiff told Dejackome that the written proposal contained, Dejackome was of the opinion that the proposal did not appear to be similar to what he believed Ferguson had told him he was planning to propose to plaintiff at the December 3rd meeting. Dejackome deposition, pgs. 94-8; 110-11.
Plaintiff had until December 20, 1993 to revoke his acceptance of the VRP, including the release. Plaintiff asserts that he attempted to reach both Roth and Ferguson by telephone on December 20th, but was unable to do so. Plaintiff never did revoke his acceptance either orally, in writing, or by e-mail.
As of December 31, 1993 plaintiff officially "retired" from his employment with Monsanto. There is no dispute that plaintiff has received the benefits due him under the VRP. Although plaintiff did not have a signed consulting contract with Monsanto, he performed some services, in the early part of 1994, presumably on Monsanto's behalf in order to "help" Dejackome. Plaintiff's deposition, pgs. 134-35. There is some dispute as to the exact circumstances under which plaintiff performed these services. In the latter part of February 1994, plaintiff requested payment for the services he had rendered in 1994. To date, plaintiff has not received payment as requested.
*1350 On August 25, 1994 plaintiff filed a charge of discrimination against Monsanto with the Georgia agency office of the EEOC.[6] Plaintiff's Exhibit E to his complaint. Within six (6) days of filing his discrimination charge, plaintiff's counsel contacted Monsanto's counsel to inform them that plaintiff was seeking a right to sue letter, and that he wished to discuss settlement of his allegations prior to the filing of his anticipated lawsuit. Plaintiff's Exhibit G to his complaint. On September 21, 1994 the EEOC issued its right to sue letter having been informed by plaintiff's attorney that plaintiff intended to file suit. Plaintiff's Exhibit F to his complaint. On February 6, 1995 plaintiff filed suit in the United States District Court, Northern District of Georgia, Atlanta Division. On April 5, 1995 venue was transferred to the United States District Court for the Eastern District of Missouri, Eastern Division and assigned to this Court.
Plaintiff contends that he is not precluded from bringing this lawsuit because the release he signed was not done "knowingly and voluntarily" as required under the Older Workers' Benefit Protection Act (OWBPA), 29 U.S.C. § 626(f). He avers that defendant intentionally misrepresented and fraudulently induced plaintiff into signing the VRP documents and release by first offering him a $125,000.00 consulting agreement, and then waiting until after he signed the release, to offer him a different written agreement worth less (than the one allegedly offered him at the December 3rd meeting). He further avers that Roth and Ferguson knowingly committed the fraud because they knew he wouldn't sign the release unless he believed that he was receiving a profitable consulting agreement in exchange for giving up his stock options. Plaintiff further avers that common law ratification of contract principles are inapplicable to a waiver of ADEA claims. Plaintiff further avers that he could not have waived his state law claims for fraud and misrepresentation because he did not have a dispute regarding these potential claims at the time he signed the waiver. Finally, plaintiff avers that defendant has breached his written employment contract by failing to give him 90 days written notice prior to his termination.
Defendant contends that plaintiff signed the release "knowingly and voluntarily" because the written proposal set forth the same terms as discussed at the December 3rd meeting. Defendant further contends that even if the release was signed in violation of the OWBPA, plaintiff has ratified the release by failing to revoke it within the allotted time-period and by retaining the benefits received under the VRP. As to the state law claims for fraud and misrepresentation, defendant contends that plaintiff has waived these claims; or in the alternative, that nothing was misrepresented to plaintiff and that the written proposal outlines the same figures discussed at the December 3rd meeting. Defendant contends that plaintiff has waived the notice requirement of his employment contract because the release specifically states that the consideration paid is in lieu of any form of contractual notice plaintiff might otherwise be entitled to receive. Alternatively, defendant contends that the terms set forth in the written proposal are the ones discussed at the meeting on December 3rd and that plaintiff lacks any evidence that either Roth or Ferguson knowingly intended to deceive plaintiff at the December 3rd meeting. Finally, defendant contends that plaintiff is not entitled to recover any payment under his quantum meruit claim because any services he performed (after his termination) were done gratuitously and without any expectation of payment (since no consulting contract existed between defendant and plaintiff).
The only state law claim not really debated by the parties is the plaintiff's claim for breach of oral contract. Plaintiff contends that an oral contract was reached at the December 3rd meeting. Defendant contends that no oral contract existed as a result of that meeting because obviously no "meeting of the minds" occurred since the parties have vastly different ideas as to what was discussed. Defendant also notes that plaintiff *1351 undeniably refused to agree to anything discussed and wanted first to see the proposal in writing. Finally, defendant points out that even if an oral contract was created it is unenforceable because it violates the Statute of Frauds since the allegedly contracted services would not be performed within one (1) year of the date the alleged contract was made. Plaintiff fails to rebut any one of the defendant's arguments for dismissal of the claim for breach of oral contract.
Before addressing the specific issues raised in the defendant's motion, the Court needs to first address the question of which state law (and to some extent, which federal circuit law) is applicable to the legal issues present in this case. Plaintiff was a resident of Michigan when the acts complained of occurred. However, he moved to Georgia (following his termination) and filed his discrimination charge with the EEOC office in Atlanta. Defendant has branch offices and does business in both Michigan and Georgia; however, it is headquartered in St. Louis County in Missouri.
The parties do not state where the 1960 employment contract was signed. From the pleadings it appears that Mr. Bilton either resided and worked in Missouri at the time, or he resided and worked in Georgia at the time (it is clear from his affidavit that he did not begin residing in Michigan until 1977). The telephone call of September 28, 1993 originated from Dejackome's office in St. Louis. The December 3, 1993 meeting was held in St. Louis. Since the significant events giving rise to plaintiff's claims occurred in St. Louis, and the parties appear to argue predominantly Missouri state law, as well as federal law within this district and the Eighth Circuit, the Court believes that Missouri law (and for the most part, federal law from within this district and the Eighth Circuit) governs this lawsuit.

Plaintiff's ADEA Claim
Federal law requires that a plaintiff, before proceeding to court to pursue an ADEA claim, must first file a charge of discrimination with the EEOC within 180 days of the "alleged unlawful practice" in a non-deferral state, 29 U.S.C. § 626(d)(1), and within 300 days of the employer's wrongful conduct in a deferral state, 29 U.S.C. § 626(d)(2). Since Missouri has a law prohibiting age discrimination and a state agency to handle such complaints (the Missouri Commission on Human Rights), it is a "deferral state". This administrative deadline for filing an EEOC charge is not jurisdictional; rather, it is treated like a statute of limitations subject to waiver, estoppel, or tolling. Dring v. McDonnell Douglas Corp., 58 F.3d 1323, 1327 (8th Cir.1995) citing Zipes v. Trans World Airlines, 455 U.S. 385, 393, 102 S.Ct. 1127, 1132, 71 L.Ed.2d 234 (1982). If a plaintiff files an untimely charge with the EEOC, the lawsuit is barred unless a plaintiff can successfully demonstrate that the time for filing should be equitably modified. Dring, at 1327.
In the instant case, the parties dispute at what point the time for filing the EEOC charge began to run. Defendant argues that the accrual date is the date plaintiff was notified that his position was eliminated and his employment would be terminated as of December 31, 1993. Plaintiff argues that the accrual date is no earlier than the latter part of November because until then plaintiff was in the "employee pool" and his requests for continued employment had not been rejected by Ferguson.
The United States Supreme Court has clearly held that the filing time for an EEOC charge begins to run when the plaintiff receives notice of a termination decision. Chardon v. Fernandez, 454 U.S. 6, 8, 102 S.Ct. 28, 29, 70 L.Ed.2d 6 (1981); Delaware State College v. Ricks, 449 U.S. 250, 259, 101 S.Ct. 498, 504-05, 66 L.Ed.2d 431 (1981). In the context of an ADEA action, it is well-established within the Eighth Circuit that the accrual date is the date on which the challenged employment decision is communicated to the employee. Dring, at 1328; Harlston v. McDonnell Douglas Corp., 37 F.3d. 379, 382 (8th Cir.1994). Furthermore, the accrual date is "simply the date on which the adverse employment decision is communicated to the plaintiff", and not on the date the decision becomes effective. Dring, at 1328; Harlston, at 382.
*1352 Plaintiff does not argue that the filing period should be equitably tolled or estopped. Instead he simply argues that because he was placed in the "employee pool" and remained eligible for continued employment until late November 1993, the "accrual date" is some unknown date in November 1993, not the date of notification of termination (September 28, 1993). Plaintiff's argument is meritless.
The United States Supreme Court has unequivocally held that the accrual date for an employment discrimination action is the date of notification of the challenged employment decision. Furthermore, the Eighth Circuit Court of Appeals has consistently held that the possibility of alternative employment within the company does not alter the accrual date, nor delay the running of the filing period. Wilson v. Westinghouse Elec. Corp., 838 F.2d. 286, 288 (8th Cir.1988); Heideman v. PFL, Inc., 904 F.2d 1262, 1267 (8th Cir. 1990) citing Kriegesmann v. Barry-Wehmiller Co., 739 F.2d. 357, 358 (8th Cir.1984).
Plaintiff understood that continued employment within the company was not a viable option. Plaintiff's deposition, pg. 46-47. Being placed in the "employee pool" along with many other terminated employees was a standard practice and not a significant effort by the defendant to specifically locate another position for Bilton. Ferguson's one-time request to his division managers to consider Bilton for a position within their departments was also not a particularly major effort on his part to secure another position for Bilton. It was nothing more than a request; not a recommendation nor a directive. Ferguson deposition, pg. 55. Plaintiff has produced no evidence which demonstrates any excusable ignorance on his part as to a possible ADEA violation (in fact, plaintiff suggested the possibility of litigation when first informed of his termination) justifying the invocation of the doctrine of equitable tolling; or any positive misconduct by the defendant designed to purposely impede plaintiff from timely filing his EEOC charge, justifying the invocation of the doctrine of equitable estoppel. Dring, at 1328-1329.
It is undisputed that on September 28, 1993 plaintiff was notified of the elimination of his position, and the termination of his employment. Plaintiff has failed to set forth any evidence which provides the basis for applying the doctrines of equitable tolling or equitable estoppel in order to modify the filing period for his EEOC charge. Since plaintiff filed his charge approximately 331 days after the notification of his termination, plaintiff's EEOC charge was untimely filed, and his subsequent lawsuit is time-barred.
Monsanto argues in the alternative that Bilton's failure to tender back the severance benefits he received under the VRP in exchange for the release of claims (especially an ADEA claim) precludes his lawsuit, even if the release was not "knowing and voluntary" as required by the OWBPA, 29 U.S.C. § 626(f). Plaintiff contends that since plaintiff was "fraudulently induced" to sign the VRP documents (including the release), his waiver was not "knowing and voluntary". He further argues that the ADEA's legislative history, coupled with the OWBPA's lack of any requirement that a plaintiff tender back the consideration received for executing a waiver of claims prior to pursuing an ADEA lawsuit, undermines the applicability of the doctrine of contract ratification to this case.
The OWBPA amended the ADEA to provide older workers with protection when faced with waiving their ADEA rights, and also to provide employers with the means to enforce such a waiver. The OWBPA provides that "an individual may not waive any right or claim under this chapter unless the waiver is knowing and voluntary." 29 U.S.C. § 626(f). The OWBPA contains very specific requirements for a waiver to be found "knowing and voluntary". These requirements include, but are not limited to, specifically referring to the ADEA, advising the individual in writing to consult an attorney prior to executing the document(s), and providing a grace period in which to revoke the waiver. See, 29 U.S.C. § 626(f)(1)(A)-(H).
*1353 The parties do not seriously dispute that the OWBPA requirements were met.[7] Plaintiff was given the statutory required 45 days to consider the VRP package and release. The VRP package gave to the plaintiff enhanced severance benefits, he was not otherwise entitled to, in exchange for the release. He was provided with the statutory seven (7) days to revoke the release and chose not to do so. The VRP package provided plaintiff with a listing, by age and classification, of all eligible and ineligible individuals for participation in the program. Given these undisputed facts, the release met the statutory requirements of OWBPA; thus, plaintiff's execution of it was "knowing and voluntary".
Even assuming, for the sake of the instant summary judgment motion, that the release did not meet the requirements of the OWBPA in that due to the defendant's alleged fraudulent inducement, plaintiff's execution of the release was not knowing and voluntary, the VRP agreement and release became voidable and not void. A voidable release can be enforced if it is ratified by the employee. Wittorf, et. al. v. Shell Oil Co., 37 F.3d. 1151, 1154 (5th Cir.1994).
This Court finds that when the plaintiff accepted the enhanced benefits, as provided by the VRP package, and chose to not revoke his release and not tender back the benefits received in consideration for the release, plaintiff manifested his intention to be bound by the terms and conditions of the VRP documents, including the release. In reaching this conclusion, the Court adopts the reasoning of the courts in Blistein v. St. John's College, 74 F.3d. 1459 (4th Cir.1996); Blakeney v. Lomas Information Systems, Inc., 65 F.3d. 482 (5th Cir.1995); Wittorf, supra., Wamsley v. Champlin Refining and Chemicals, Inc., 11 F.3d. 534 (5th Cir.1993); Hodge v. The New York College of Podiatric Medicine, 940 F.Supp. 579 (S.D.N.Y.1996); Long v. Sears, Roebuck and Co., 1996 WL 94537 (E.D.Pa.1996). This Court further concurs with the findings of the Honorable George F. Gunn in Rivers v. Northwest Airlines, Inc., 1995 WL 888612 (E.D.Mo.1995) that the major contrary authority, Oberg v. Allied Van Lines, Inc., 11 F.3d. 679 (7th Cir.1993) is "unpersuasive", especially in light of the fact that in a later Seventh Circuit opinion, Fleming v. United States Postal Service AMF O'Hare, 27 F.3d. 259 (7th Cir.1994), another panel of the appellate court questioned the wisdom of the Oberg decision. Consequently, the failure of Bilton to tender back the benefits received as consideration for the release precludes his ADEA claim.

Plaintiff's State Law Claims
In light of the fact that this Court has determined that plaintiff's ADEA claim is time-barred, or in the alternative, precluded by his execution and/or ratification of the VRP documents and release, the Court elects not to exercise its pendent jurisdiction over the remaining state law claims pertaining to breach of employment contract, fraud, misrepresentation, and quantum meruit. However, as to the breach of oral contract claim, the Court will exercise its pendent jurisdiction and finds that an oral contract was never reached because the evidence before this Court clearly shows that the parties never reached a "meeting of the minds" as to the terms of such a contract, or in the alternative, that such a contract is prohibited under the Statute of Frauds because it could not be performed within one (1) year of the date of the making of the alleged oral contract. In order to promote fairness and judicial efficiency, the Court will remand the *1354 remaining state law claims to the Circuit Court for the County of St. Louis for further adjudication.
NOTES
[1] At the deposition of the plaintiff, plaintiff's counsel stated, for the record, that Counts IV, V, and X of plaintiff's complaint would be dismissed. As of November 27, 1996 the aforementioned counts were dismissed from this case.
[2] At the time of the filing of the defendant's motion for summary judgment, plaintiff's counsel had not yet formally dismissed Counts IV, V, and X. Defendant's counsel, relying on plaintiff's counsel's remarks at the deposition of the plaintiff, filed defendant's motion for summary judgment seeking dismissal of Counts I, II, III, VI, VII, VIII, and IX only.
[3] Defendant Monsanto Company is headquartered in St. Louis, Missouri.
[4] The VRP specifically stated:

"Please carefully review the Agreement and Release below and sign it to indicate your acknowledgment, agreement and acceptance of these terms. You have until 5:00 p.m., December 13, 1993 in which to sign the Agreement and Release and deliver it to your Director of Human Resources (or his or her designee). If you sign the Agreement and Release, you will release Monsanto from all claims you may have against Monsanto relating to the termination of your employment (including those under the Age Discrimination in Employment Act of 1967, as amended) that arise up to the date the Agreement and Release is signed. Because it is a release, you are hereby advised that you should consult with an attorney prior to executing the Agreement and Release. If you do consult with an attorney, it will be at your own expense. If you sign the Agreement and Release, you will have until seven (7) days after you sign it, in which to revoke your decision, in which case the Agreement and Release shall not become effective or enforceable by either party."
[5] There is no dispute that the written employment contract entered into between the plaintiff and defendant Monsanto on May 11, 1960 is valid; and requires 90 days written notice of termination of employment by either party.
[6] At the time of the filing of his EEOC charge plaintiff had moved and was a resident of the State of Georgia.
[7] In his surreply (# 55) plaintiff attempts to argue that the OWBPA requirements were not met because the written proposal for the consulting agreement was not included in the original VRP package and since it was received on December 16, 1993, plaintiff did not have 45 days to consider it and an additional seven (7) days to revoke his release. The Court considers this argument meritless. The prospect of a consulting agreement was never even approached until sometime after plaintiff, as well as a number of terminated employees, received the VRP package. The prospect of a consulting agreement was not a standard part of the VRP package. Whatever the terms of the consulting agreement should have been, the evidence before the Court clearly shows it to be an independent agreement meant to compensate plaintiff for his stock options only. However, as will be shown, even if the waiver did not meet the OWBPA requirements, this fact is immaterial to the issue of ratification.