Gary RACZAK, Bernard Surma, Loraine Holmes, Gladys Moore, Carole Chandler, Lou Ann Fox, M. Jean Kruse, Phyllis Tarpley, and Thomas Satkiewicz, Plaintiffs–Appellees,

v.

AMERITECH CORPORATION, Ameritech Services, Inc., and Michigan Bell Telephone Company, Defendants–Appellants.

No. 95–1082.

United States Court of Appeals, Sixth Circuit.

Argued Aug. 4, 1996.

Decided Jan. 9, 1997.

Beth M. Rivers, argued and briefed, Rudy J. Huizenga, argued, Huizenga, Hagan, Hergt & Rivers, Detroit, MI, for Carole Chandler, Bernard Surma, Thomas Satkiew-icz, Loraine Holmes, Gladys Moore, Jean Kruse, Phyllis Tarpley, Lou Ann Fox, Dorothy Payne and Gary Raczak.

Beth M. Rivers, argued and briefed, Huizenga, Hagan, Hergt & Rivers, Detroit, MI, for George Kinsella, Louise Ward Neal, Rex Steyskal and Cathleen Longan.

Donald A. Van Suilichem, argued and briefed, Valerie L. MacFarlane, Van, Suilichem & Brown, Troy, MI, for Ameritech Corporation, Ameritech Services, Inc.

Albert Calille, briefed, Michigan Bell Telephone Company, Detroit, MI, for Michigan Bell Telephone Company.

Ann E. Reesman, briefed, Douglas S. McDowell, McGuiness & Williams, Washington, DC, for Amicus Curiae Equal Employment Advisory Council.

Peter Van Schaick, briefed, Peter Van Schaick, P.C., Glen Ridge, NJ, for Amicus Curiae National Employees Lawyers Association.

Thomas W. Osborne, briefed, American Association of Retired Persons, Washington, DC, for Amicus Curiae American Association of Retired Persons.

Before: JONES, GUY, and BOGGS, Circuit Judges.

BOGGS, J., delivered the opinion of the court in Parts I and II, in which JONES and GUY, JJ., concurred. JONES, J. (pp. 1268–71), delivered a separate opinion with respect to the issue addressed in Part III, in which GUY, J. (p. 1271), concurred in a separate opinion, making Judge JONES's opinion the opinion of the court on the Part III issue.

BOGGS, Circuit Judge.

Plaintiffs Gary Raczak, Bernard Surma, Loraine Holmes, and Gladys Moore worked for defendant Michigan Bell Telephone Co. Plaintiffs Carole Chandler, Lou Ann Fox, M. Jean Kruse, Phyllis Tarpley, and Thomas Satkiewicz worked for defendant Ameritech Services Inc., a subsidiary of Ameritech Corp. They sued their employers under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq., as amend-

ed by the Older Workers Benefit Protection Act ("OWBPA"), 29 U.S.C. § 626 *et seq.,* alleging that they were selected to be fired under defendants' workforce reduction programs solely on the basis of their age.[1]

Defendants countersued for breach of contract, claiming that plaintiffs received enhanced severance packages in return for waiving such claims, and that plaintiffs' continued refusal to disgorge the benefits bars them from contesting the agreements' validity.

Both sides moved for summary judgment. In an order dated August 1, 1994, the district court denied defendants' motions and granted plaintiffs' motion. The court held that the defendants had not furnished the terminated employees with "the job titles and ages of all individuals eligible or selected for the [downsizing] program, and the ages of all individuals in the same job classification or organizational unit who are not eligible or selected for the program," as required by 29 U.S.C. § 626(f)(1)(H)(ii). Instead, defendants had categorized the information on the employees selected and not selected by age and salary grade. Although plaintiffs and the court conceded that this was the only provision of the OWBPA that was alleged to have been breached, the court held that this flaw rendered the waivers unenforceable.

The district court also held that plaintiffs' acceptance and continued retention of the enhanced compensation benefits did not "ratify" the defective waivers, and therefore did not preclude plaintiffs from bringing suit. The court reasoned that such a "tender-back" requirement would be inconsistent with the remedial purposes of the OWBPA and would "deter meritorious challenges to releases." *Memorandum and Order of Aug. 1, 1994* (*"Memorandum and Order"*) at 20–21, 1994 WL 780899. If plaintiffs were to prevail in their suit, the court noted that

"any such recovery would be offset against the benefits they've already received from [defendants]." *Id.* at 21. It is not clear if plaintiffs agree with this statement by the court.

Defendants then asked the court to certify its order for interlocutory appeal because the order "involves a controlling issue of law as to which there is a substantial ground for difference," and that an immediate appeal could "materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). The district court agreed, and we granted the petition to appeal.

Although an interlocutory appeal allows this court to review the district court's order in its entirety, and thus any issue pertinent to the disposition of this case, we will review only the two issues addressed by the district court in its grant of summary judgment:[2] (1) whether defendants violated the OWBPA by providing plaintiffs with data organized by and relating to salary grade, in lieu of what plaintiffs characterize as "job title"; and (2) whether plaintiffs are precluded from suing by their refusal to refund the additional compensation that they received as an inducement for executing a waiver of liability.

■ Upon review and analysis, we reverse and remand the case to the district court. We unanimously conclude that because the nomenclature of § 626(f)(1)(H) of Title 29 is ambiguous, a rigid and mechanical interpretation of that provision is inappropriate. Congress's intent in enacting § 626 was to compel employers to provide data so that an employee considering waiving ADEA rights could assess, with the assistance of counsel, the viability of a potential ADEA claim. Although the OWBPA is lengthy and detailed, clause (H)(ii) of § 626(f)(1) is not as precise, referring to concepts of "job title," "job clas-

---

1. Plaintiffs originally sued for defamation as well, but have since withdrawn that cause of action.

2. In a post-oral argument submission, plaintiffs urge us to find that defendants violated ERISA, and that this fact voids the releases as being against public policy. Plaintiffs cite *Spink v. Lockheed Corp.,* 60 F.3d 616 (9th Cir.1995), *rev'd,* —— U.S. ——, 116 S.Ct. 1783, 135 L.Ed.2d

153 (1996) as authority, but they fail to note that in that case, "[t]he increased benefits [offered as consideration for the releases] were paid out of the Plan's surplus assets." *Id.* at 619. Not only is there no evidence that Ameritech or Michigan Bell dipped into its employees' pension fund, but plaintiffs have not alleged an ERISA claim, nor did they argue the issue before the district court. Therefore, we decline to address the issue.

sification," and "organizational unit"—terms not defined within the OWBPA. Holding an employer strictly accountable for what might be a technical violation of these imprecise terms, with no indication that this would facilitate the provision's purpose and might even hamper it, is untenable and would elevate form over substance. Accordingly, we remand to the district court with instructions to determine whether the data that defendants supplied to plaintiffs fulfilled the requirements of the OWBPA by providing information, "in a manner calculated to be understood by the individual" participant, that would allow that individual to understand and gauge the prospects of an ADEA claim.

The panel is split with respect to the question of ratification and the proper procedure upon remand. I would reverse on the issue of ratification as well, and in so doing, distinguish between the doctrine of ratification and the "tender-back" doctrine and adopt the latter. However, the remaining two members of the panel, for the varying reasons set forth in their separate opinions, agree that plaintiffs in this case may continue their suit upon remand without tendering back their waiver payments, and that view is thus the opinion of the court.

## I

In September 1992, Ameritech announced that it would be reducing the number of managers through voluntary and involuntary terminations through its Workforce Resizing Program. Under the *voluntary* retirement program, any management employee could retire early and receive two additional years of service credit, a supplemental payment, and a favorable interest rate in calculating lump sum pension distributions. These employees were required to select this option before November 2, 1992.

The remainder of the downsizing was to be accomplished through the involuntary termination component of the plan. In the first phase, Ameritech designated an "at-risk pool" consisting of the lowest-performing 30% of managers, based on 1990 and 1991 incentive payments and bonuses. Workers in these at-risk pools were grouped according to their salary grade (of which there were about twelve), and those in each salary grade were subdivided into smaller groups to create more manageable comparison groups (those in subgroups of less than ten were compared on a company-wide basis).

The second phase of the involuntary component involved classifying the at-risk employees based on assessments of their job performance, specific job skills or expertise, leadership ability, and potential for growth. Each employee was rated by the appropriate supervisor on each of the four factors, and the employees were ranked based on their average rating. After Ameritech vice-presidents determined how many employees needed to be trimmed to achieve the downsizing goals, the individuals to be terminated were selected anonymously, based on the lowest average performance ratings. Michigan Bell's Workforce Resizing Program was almost identical in its methodology and system of classification.

All of the Ameritech and Michigan Bell plaintiffs were involuntarily terminated, except for Raczak,[3] who took early retirement. Each employee received a packet describing the supplemental severance benefits available if the Michigan Bell plaintiffs would sign a "Termination Agreement, Waiver, and Release"; the Ameritech plaintiffs were offered a similar "Waiver and Release." All pages of both waiver forms were clearly labelled at the top with *"PLEASE CONSULT WITH AN ATTORNEY BEFORE EXECUTING THIS DOCUMENT,"* as required by 29 U.S.C. § 626(f)(1)(E) [4].

**3.** Raczak's situation differs slightly from that of his co-plaintiffs. His waiver was dated and notarized on November 9, 1992, and he withdrew the waiver on November 17, one day past the one-week grace period for revocation permitted by 29 U.S.C. § 626(f)(1)(G). However, Raczak claimed that he actually executed the waiver on November 10 and that he and the notary backdated it

because he believed that he was required to sign it by the 9th. The district court was unpersuaded, and it rejected his renunciation. Nonetheless, the validity of Raczak's initial waiver became immaterial after the court found all of the plaintiffs' waivers defective.

**4.** The plaintiffs received bonuses ranging from $22,275.05 to $72,690.27.

The waivers also satisfied the other conditions of 29 U.S.C. § 626(f)(1) because they were "written in a manner calculated to be understood ... by the average individual"; the waivers referred specifically to ADEA claims; they did not waive rights arising after the date of execution of the waiver; each employee received consideration beyond that owing; employees were given 45 days to evaluate the waivers and incentives; and employees were given seven days to revoke a signed waiver. See *Memorandum and Order* at 10 ("Plaintiffs acknowledge that all but one of the requirements of 29 U.S.C. § 626 were met....")

Additionally, all Michigan Bell plaintiffs (except for Raczak) received a chart listing the numbers of employees "selected" and "not selected" for involuntary termination, broken down by age and salary grade; the same was true for Ameritech plaintiffs, except that Ameritech used the phrases "selected" and "retained." Ameritech also stated that it provided the names of all 6,600 employees and their ages, grades, and whether selected or not. JA at 565. This information was provided in order to comply with 29 U.S.C. § 626(f)(1)(H), the provision at issue in this case:

(1) ... a waiver may not be considered knowing and voluntary unless at a minimum—

...

(H) if a waiver is requested in connection with an exit incentive or other employment termination program offered to a group or class of employees, the employer ... informs the individual in writing in a manner calculated to be understood by the average individual eligible to participate, as to—

(i) any class, unit, or group of individuals covered by such program, any eligibility factors for such program, and any time limits applicable to such program; and

(ii) the job titles and ages of all individuals eligible or selected for the program, and the ages of all individuals in the same job classification or organizational unit who are not eligible or selected for the program.

Plaintiffs argue that defendants violated this section by using salary grade to stand for "job title," "job classification," or "organizational unit," and that the failure to provide the information in an appropriate manner prevented them from accurately assessing whether they had a valid claim under the ADEA. Defendants contend that cataloging the information by salary grade was the best method of providing the data, because job titles did not adequately describe or identify an employee's position or prospects in the organization. Rather, positions with similar or the same job titles occur throughout several pay tiers, so that comparable titles are not comparable in any other respect. Further, using salary grade was appropriate because the defendants compared employees by salary grade in selecting persons to be terminated.

The plaintiffs first attempted to resolve their grievances through the EEOC. The Detroit Office of the EEOC initially concluded in May 1993 that "the waiver and release were executed in [sic] voluntary and knowing fashion, and ... does not establish a violation of the statute." JA at 193, 196, 199. The EEOC was unable to mediate a resolution to the dispute, and the plaintiffs filed suit. However, in September 1994, after suit had been filed, the EEOC made a determination in which it stated that it made "no finding with regard to the issue of waivers." JA at 993, 996, 999. The plaintiffs have not returned any of the additional benefits that they received in exchange for signing the waiver agreement.

## II

This court reviews *de novo* the district court's grant of a motion for summary judgment. *Baggs v. Eagle–Picher Indus.*, 957 F.2d 268, 271 (6th Cir.), *cert. denied*, 506 U.S. 975, 113 S.Ct. 466, 121 L.Ed.2d 374 (1992). Likewise, a district court's conclusions of law are subject to *de novo* review on appeal. *United States v. Braggs*, 23 F.3d 1047, 1049 (6th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 274, 130 L.Ed.2d 191 (1994); *Whitney v. Brown*, 882 F.2d 1068, 1071 (6th Cir.1989). An appellate court must review the evidence

"in the light most favorable to the nonmoving party...." *See, e.g., Oscar W. Larson Co. v. United Capitol Ins. Co.*, 64 F.3d 1010, 1012 (6th Cir.1995).

■ The OWBPA places the onus of proving a knowing and voluntary waiver squarely on defendants:

> In any dispute that may arise over whether any of the requirements, conditions, and circumstances set forth in subparagraph[s] [ (A)-(H) ] of paragraph (1) ... have been met, the party asserting the validity of the waiver shall having the burden of proving ... that a waiver was knowing and voluntary pursuant to paragraph (1) or (2).

29 U.S.C. § 626(f)(3).

Although several cases discuss the general criteria for finding an employment waiver to be knowing and voluntary, those cases are pre-OWBPA, so there is little law interpreting the degree of compliance required by § 626(f)(1)(H).

In the only published opinion specifically evaluating compliance under § 626(f)(1)(H)(ii), the district court enforced the waiver because the employer had satisfied all of the statutory elements. *Anderson v. Lifeco Serv. Corp.*, 881 F.Supp. 1500 (D.Colo.1995). The court found the requirements of the clause were satisfied because "[t]he termination package included the *names* and ages of the other employees who were terminated as part of the reduction in force and the *names* and ages of those employees unaffected by the reduction." *Id.* at 1503 (emphasis added). There is no mention of the listing including "job titles," so the

*Anderson* court upheld the waivers despite an apparent lack of technical compliance with the statute's language.[5] Another appeals court, although ruling on a different issue, noted in passing that "[n]either 'job classification' nor 'organizational unit' is defined" in the OWBPA, but that the phrases should not be interpreted "contrary to their naturally broad meaning...." *Griffin v. Kraft Gen. Foods, Inc.*, 62 F.3d 368, 372 (11th Cir.1995).

■ It is not clear whether, in drafting the statute, Congress "painted with a broad brush and left it to the courts to 'flesh out' the statute by fashioning a body of substantive federal law," so that we "may fashion a body of federal common law," or whether the statute contains "only gaps in definitions or descriptions" so that we may only "fill these interstices ... [by] interpret[ing] or constru[ing]" these unclear provisions of the OWBPA. *Anspec Co. v. Johnson Controls, Inc.*, 922 F.2d 1240, 1245 (6th Cir.1991) (citing *Texas Indus. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640, 101 S.Ct. 2061, 2066, 68 L.Ed.2d 500 (1981)). On either basis, however, we hold that the terms "job title," "job classification," and "organizational unit" should be interpreted on a case-by-case basis, with an eye to the purposes of the Act, rather than as a dogmatic exercise in definition.

Since the key terms in clause (H)(ii) are not terms of art, and are not specifically defined in the statute, we must interpret what meaning should be given to "job title," "job classification," and "organizational unit" in the context of the waiver provisions of the OWBPA. At the conceptual level, Congress

---

5. The court below relied on two unpublished decisions rendered by the same district judge, *Adams v. Indiana Bell Tel. Co., Inc.*, IP 93 420 C (S.D.Ind. May 18, 1994), and *Allard v. Indiana Bell Tel. Co., Inc.*, IP 93 1346 C (S.D.Ind. May 18, 1994), which involved the same issue. The court recognized that to make a prima facie case of age discrimination in a suit challenging a reduction-in-force, a plaintiff must only show "a pattern of downsizing that could ultimately benefit a person not a member of the protected class." JA at 41 (*Allard*, slip op. at 12). In such cases, information relating age with job duties or skills is more probative for showing age discrimination because:

> [o]ne way to evaluate whether such a pattern exists is to look at the job titles and ages of all terminated employees and then compare that information with the ages of nonselected employees who perform similar or related work and are thus likely to take over the terminated employees' duties or perform jobs that the plaintiff is likely to be qualified to perform.... To make a similar evaluation under circumstances where the employer produces only the ages and *salary grades* of the selected and nonselected employees requires an assumption that employees within the same salary grade perform the same or related work. Such an assumption is not warranted. And, under a literal application of the statutory language, such an assumption is not allowed.

JA at 41–42, *Allard*, slip op. at 12–13.

wanted to be sure that workers who signed a waiver had a clear idea of what they were giving up, particularly that they had the ability to assess the value of the right to sue for a possibly valid discrimination claim.

At the procedural level, however, it is in the interest of a worker seeking to void a release to be dissatisfied with *any* methodology that the company used in attempting to comply with clause (H)(ii). Thus, a job title could be considered anything from an extremely specific, indeed unique, designation of the job slot ("RC Numbers"), to very specific title (e.g., "Attorney in charge of corporation taxes for Idaho"), to subspecialty ("tax lawyer"), to profession ("lawyer"), to rank ("supervisor or supervising lawyer"), to hierarchical position ("Vice–President"). Each of these might make sense, yet each of them also could be attacked as misleading and plaintiffs could claim that the "job title" used should have been supplanted by one of the others. Plaintiffs have put in the record two pages of a directory from one of the defendant companies, which purports to show a variety of actual "job titles" used by the company, and presumably is the kind of information that plaintiffs now contend is definitively demanded by the statute. Exhibit 2 to Plaintiffs' Brief in Response to Motion for Evidentiary Hearing. JA at 914–15. However, a perusal of those pages indicates the very complexity of the argument. In the space of two pages, a group of employees in apparently closely related employment are referred to by a variety of names ranging from simple "analyst" to "analyst-installation" to "analyst-Michigan CA7 support" to "analyst" with a variety of geographic qualifiers, to "senior analyst." Had the defendants simply turned over this booklet, with the necessary ages and selection results appended, plaintiffs could certainly have made a strong complaint that that information was not usable or understandable. Similarly, had defendants grouped the varieties of "analysts" in any of a number of quite plausible ways, it could certainly have been contended that a differing methodology would have been instead the single "job title" sought by the statute.

Similarly, the "organizational unit" has been the subject of comparable attacks. In *Griffin,* a claim that other job types at other plants should have been included was accepted. 62 F.3d at 372–73. In the case of *Long v. Sears Roebuck & Co.,* No. CIV. A. 95–0141, 1996 WL 94537 (E.D.Pa., Mar. 1, 1996), a claim was made that information on those not selected should have been given not just for the Sears facilities affected by the lay-offs, but for Sears employees *either* (a) nationwide or (b) within Pennsylvania. *Id.* at *4–*5. The district court did not rule on this point, simply holding that there was sufficient factual dispute that summary judgment was precluded. *Id.* at *8. This again shows how a rigid concept that there is only one correct "organizational unit" can be used to attack the validity of any waiver. As with job titles, it is in the interest of the worker trying to void the release to quibble with whatever definition was used by the company.

At the same time, it is certainly possible that an employer will want to fiddle with the definition to mask the possible evidence for age discrimination. Thus, as a speculative example, if the company had actually decided to fire all the old tax lawyers, but not to touch other lawyers, or to be non-discriminatory in its treatment of all other lawyers, it would be in its interest to use a wider category such as all lawyers, to disguise the smaller sub-unit of discrimination. One the other hand, using very small sub-units could also mask discrimination because it is much more difficult to show or perceive discrimination when only very small numbers are involved. *Cf. Black v. City of Akron,* 831 F.2d 131 (6th Cir.1987). The so-called "4/5ths Rule," 29 C.F.R. § 1607.4D (1987), notes that small samples make a finding of discrimination difficult. *See Fudge v. City of Providence Fire Dep't,* 766 F.2d 650, 658 n. 10 (1st Cir.1985), *cited in Black,* 831 F.2d at 134.

■■■ So, we return to the question of how best to interpret this section in terms of the intent of the statute, as well as the words used. The touchstone should be the "understandable to the average worker" standard. If the employer provides information that purports to comply with the statute, then the inquiry should move to the question of under-

standability. Here, the company did provide the exact ages of all workers, and whether they were selected or not, by what it calls "job title"—the salary grade—as well as either the organizational unit (which defendants say is the entire company), or else the job classification of all those not selected—also the salary grades.

This should be enough to prevent summary judgment for the employees at this stage. At the same time, the argument they raised, that the salary grade classification was not the way workers thought of themselves and their jobs, should be enough to prevent summary judgment for company, at this stage. We note that plaintiffs themselves use varying terms, almost interchangeably. Within less than one page of their brief, pages 3–4, they refer to "department," "division," "segment," "departmental unit," "work group," and "work unit."

■ On remand, the district court should focus on the question of understandability to a worker who is trying to assess whether age discrimination actually occurred, and trying to assess what the prospects of a suit would be, whether or not discrimination actually occurred.

In this inquiry, some of the factors that will be relevant, without seeking to be exhaustive, will include:

— Whether the company used its proffered titles and classifications in its work processes, prior to the layoffs;

— Whether the titles and classifications were used in assessing or choosing workers for layoffs;

— Whether the titles and classifications were meaningful to the average worker in his or her understanding of the workplace and the layoff process.

These are matters on which further discovery or an evidentiary hearing should be held below. The district court should then rule on whether clause (H)(ii) has been satisfied, based on the criterion of whether the employer provided the required information in a form, whatever the exact nomenclature, that is understandable to the average worker in voluntarily deciding to give up the right to sue.

The inquiry of the district judge in this case was defective only in focusing ultimately on a formal consideration of whether a particular form of words was a "job title" or not, rather than inquiring as to the suitability of the information furnished in satisfying the goal of the statute.

We note that the statute requires that the data be in a form "calculated to be understood by the *average individual eligible to participate,*" so the court should consider whether categorizing managerial employees by salary grade is sufficiently informative for its audience of eligible employees—in this case, managerial employees. Defendants assert that to this group, a formal title such as "manager" or "director" actually conveys *less* information than the salary grade.

Depending on the factual situation of the organization, a salary grade or hierarchical level may be the most meaningful description. Thus, in the military, a "Captain" may command an infantry unit or manage a complex repair function, but at promotion time and in many other situations, the rank itself is the most meaningful description. Similarly, in the civil service, a rating as GS–12 or GS–15 may be more meaningful than a formal civil service job title, which may be only something like "analyst" or "attorney-advisor," regardless of the type of tasks actually performed.

The district court must also assess whether salary grade classifications provide a basis for comparing equivalent positions in order to assert intentional age discrimination based on circumstantial evidence of statistical differences. Additionally, the defendants selected the individuals to be terminated from a pool of employees organized by their salary grade, so the district court must determine whether categorizing the data in this manner is reasonable and appropriate under the facts of this particular case. Finally, although the district court specifically rejected plaintiffs' attack on the defendants' method of determining what employees should be counted as "selected" or "retained," and held that the method of classifying employees as selected or not selected "complied with the require-

ments [of OWBPA]," [6] plaintiffs' challenge to the understandability of that distinction may also be taken into account in making the ultimate determination on the suitability of the information.

## III

As noted above, I disagree with the remainder of the panel as to whether plaintiffs may maintain their suit for age discrimination, in the face of their own signed waivers, for which they received tens of thousands of dollars, without returning the money they received for a promise they no longer intend to keep. This tender-back doctrine is closely related to the contractual principle of ratification: if a party was induced to make a contract through mistake, fraud or duress, his failure to repudiate the contract upon discovering the flaw (and hence the voidable nature of the contract) constitutes a new promise to perform the previously voidable duty. Those circuits that have found a tender-back requirement for suits challenging ADEA releases have concluded that an employee's retention of the enhanced severance benefits after learning that his release is voidable makes a new promise to honor the waiver despite any technical flaws. *Wittorf v. Shell Oil Co.*, 37 F.3d 1151, 1154 (5th Cir.1994) (enforcing waiver of ADEA, ERISA, and ADA claims because plaintiff kept extra severance benefits); *Wamsley v. Champlin Refining and Chemicals, Inc.*, 11 F.3d 534 (5th Cir.1993).

In *O'Shea v. Commercial Credit Corp.*, 930 F.2d 358 (4th Cir.), *cert. denied*, 502 U.S. 859, 112 S.Ct. 177, 116 L.Ed.2d 139 (1991), the Fourth Circuit applied "ordinary contract principles" both in finding a waiver valid and in holding that plaintiff ratified the waiver by retaining the benefits of a voidable contract—plaintiff could not "have it both ways." 930 F.2d at 362–63. However, the court admitted that Congress had "done no more than leave the law in its nascent state." *Id.* at 361. There have been some doubts of *O'Shea*'s continued vitality after the OWBPA amendments. N. Jansen Calamita, *The Older Worker's Benefit Protection Act of 1990: The End of Ratification and Tender Back in*

*ADEA Waiver Cases,* 73 B.U.L.Rev. 639, 648 (1993) (noting that the argument for abolishing the tender-back doctrine "is based not on the specific provisions or legislative history of the OWBPA."). Indeed, on precisely that basis, a district court in the Fourth Circuit recently refused to follow *O'Shea,* noting:

> The court in *Wamsley* stresses the value of 'giv[ing] effect to private agreements.' However, in the OWBPA, Congress was trying to protect older workers from private agreements which were unduly coercive. Permitting subsequent ratification of those agreements undermines the very purposes which the OWBPA sought to achieve.

*Blistein v. St. John's College,* 860 F.Supp. 256, 262 (D.Md.1994). However, the Fourth Circuit firmly reversed the district court, and reaffirmed its application of the common law principle of ratification. *Blistein v. St. John's College,* 74 F.3d 1459, 1465–66 (1996).

The district court in this case was persuaded by the contrary view of the Seventh and Eleventh Circuits in *Oberg v. Allied Van Lines, Inc.,* 11 F.3d 679 (7th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 2104, 128 L.Ed.2d 665 (1994), and *Forbus v. Sears, Roebuck & Co.,* 958 F.2d 1036 (11th Cir.), *cert. denied,* 506 U.S. 955, 113 S.Ct. 412, 121 L.Ed.2d 336 (1992). Those cases held that any release not complying with OWBPA was void, not merely voidable, and thus the common law requirement to tender back would not apply. Both cases relied heavily on the Supreme Court's decision in *Hogue v. Southern Ry.,* 390 U.S. 516, 88 S.Ct. 1150, 20 L.Ed.2d 73 (1968), a two-page per curiam opinion in which the Court rejected a tender-back requirement in the context of a release of FELA liability. The district court specifically agreed with the *Forbus* court, which did not want to "deter meritorious challenges" and worried that the added expense of returning the benefits would "encourage egregious behavior on the part of employers in forcing certain employees into early retirement. . . ." 958 F.2d at 1041.

In addition to relying on *Hogue,* the Seventh Circuit in *Oberg* justified its rejection of

---

6. *Memorandum and Order,* at 12.

ratification mainly on the OWBPA's displacement of state law, and with it, common law doctrines. *Oberg* interpreted the dominant policy in the OWBPA as preventing the loss of rights under the ADEA unless the decision is fully voluntary. Several other courts have followed *Oberg*'s lead. *Forbus v. Sears Roebuck & Co.,* 958 F.2d 1036 (11th Cir. 1992); *EEOC v. Sara Lee Corp.,* 923 F.Supp. 994, 998 (W.D.Mich.1995) (relying in part on the district court opinion in *Blistein,* which has been reversed by the Fourth Circuit, as noted above at 1265); *Soliman v. Digital Equip. Corp.,* 869 F.Supp. 65, 69 (D.Mass. 1994) (court followed *Hogue,* though noting that that case was governed by FELA, and that liability was conceded, as distinct from the instant cases); *Carr v. Armstrong Air Conditioning,* 817 F.Supp. 54, 58 (N.D.Ohio 1993) (court relied on *Hogue,* and stated that "any benefits paid by defendants shall be set off from any damage award received by plaintiff.").

In the recent case of *Long v. Sears Roebuck & Co.,* No. CIV. A. 95–0141, 1996 WL 94537 (E.D.Pa. Mar. 1, 1996), Judge Giles canvassed the conflicting state of the law in very much the terms that I have set out above. In that case, Sears Roebuck provided releases that purported to comport with OWBPA. Plaintiffs challenged this compliance because they believed that the "organizational unit" should include persons employed at other locations operated by the company. Judge Giles held that this raised a factual issue that could not be decided on summary judgment, and went on to consider the tender-back requirement. He noted that this question turned on whether "a release that fails to comport with OWBPA [is] void *ab initio* ... or voidable...." *Id.* at *5. After canvassing the distinction between the Seventh Circuit case of *Oberg* and the Fifth Circuit case of *Wamsley,* the court held that it was "persuaded that *Wamsley* is the correct analysis to be employed in determining the enforceability of an alleged waiver of rights under the ADEA." *Id.* at *6. *Accord Hodge v. New York College of Podiatric Medicine,* 940 F.Supp. 579, 582–84 (S.D.N.Y. 1996); *Bilton v. Monsanto Co.,* 947 F.Supp. 1344, 1352 (E.D.Mo.1996). The court also

noted that it believed that this holding was consistent with precedent in the Third Circuit, *Ponzoni v. Kraft Gen. Foods,* 774 F.Supp. 299 (D.N.J.1991), *aff'd,* 968 F.2d 14 (3d Cir.1992). In that case, the opinion considered the same two issues we have before us today: the adequacy of a release, and the effect of the retention of consideration. As Judge Giles noted, the adequacy of release issue has been superseded by the OWBPA, which laid down new rules, but the statute did not disrupt the second step of this analysis. *Id.,* 947 F.Supp. at 1352.

Because the Supreme Court has been silent on the issue of waivers since deciding *Hogue* in 1968, that case, though short and unsigned, warrants more detailed scrutiny. Hogue had injured his knee while working in the defendant railroad's repair shop, and he was offered and accepted $105 as part of a release. The carrier's doctor had assured both parties that the knee was only bruised; later, the damage was found to be permanent, and Hogue had to undergo two operations, one of which required the removal of a kneecap. Hogue sued under FELA, since the railroad was included under the Act, alleging mutual mistake of fact in the release. He did not offer to return the $105 before instituting the action. The Supreme Court held that Hogue was not required to tender back the consideration.

I believe that several aspects of *Hogue* have been overlooked. First, "[t]he question of whether a tender back of consideration was a prerequisite to the bringing of [a] suit is to be determined by federal rather than state law." *Hogue,* 390 U.S. at 517, 88 S.Ct. at 1151. *Hogue* also relies specifically on the language of FELA, 45 U.S.C. § 55, which explicitly makes any device to exempt an employee from liability "void." Therefore, whether the OWBPA displaced state and common law doctrines is irrelevant—general principles of equity and contract law exist with equal vitality in the federal sphere. The Supreme Court has also held that statutes in derogation of the common law must be stated in clear and explicit language. *Norfolk Redevelopment & Hous. Auth. v. Chesapeake & Potomac Tel. Co.,* 464 U.S. 30, 35–36, 104 S.Ct. 304, 307–08, 78 L.Ed.2d 29

(1983) ("the common law ... ought not to be deemed repealed, unless the language of the statute be clear and explicit for this purpose," quoting *Fairfax's Devisee v. Hunter's Lessee*, 11 U.S. (7 Cranch) 603, 623, 3 L.Ed. 453 (1813)). This was done in FELA but not in OWBPA. The Seventh Circuit's rejection of ratification on this basis is thus unconvincing. *Oberg*, 11 F.3d at 683 ("Had Congress not spoken this. court may have even been inclined to follow *Grillet* and *O'Shea*, and allow employees the freedom to ratify their severance agreements through general principles of contract law. However, Congress has occupied this area of law through the enactment of the OWBPA.").

Second, this point is reinforced by evidence in *Hogue* that the tender-back requirement is a generally recognized exception under federal common law:

> We reject the suggestion that a tender back of the consideration is excused only where fraud enters into the execution of the release. We hold that a tender back is also not requisite when it is pleaded that the carrier and the employee entered into the release from mutual mistake as to the nature and extent of the employee's injuries.

*Hogue*, 390 U.S. at 517, 88 S.Ct. at 1151–52 (citations omitted). This language seems to carve out fraud and mutual mistake as the two exceptions to the general rule.

Third, *Hogue* dealt with a situation where the *fact* of injury was never in doubt. As such, Hogue's release was less a release from *potential liability* than it was a settlement of a legitimate claim. In contrast, a substantial number of the employees to whom these agreements are offered could not possibly have been discharged in violation of the ADEA and do not have a valid claim. As such, they would not be entitled to anything beyond the standard severance benefits and, in a sense, receive a windfall from these waiver payments. Asking an employee who has suffered no harm to return these benefits works no hardship on him, although allowing

him to keep the money and sue completely denies the company the benefit of its bargain—abolishing the tender-back rule gives every employee two chances to settle his case.

The company, of course, has also benefitted by staving off the uncertain expense of future suits. These waivers are more cost-effective than settling a lawsuit because they occur before any litigation begins, and thus reduce attorney costs, do not require a case-by-case assessment, and preempt discovery and its attendant costs. Accordingly, employers may well pay more for a standard waiver than they would in a standard settlement.

Because the releases are offered to all employees, both victims of discrimination and not, the value of the offered incentive will increase with the frequency of legitimate ADEA claims.[7] This leads to a final inequity: *Hogue*'s consolation that, in the event of a recovery, "the sum paid [for the release] shall be deducted from any award...." 390 U.S. at 518, 88 S.Ct. at 1152. Again, this policy is fair only if the employee who signed the release suffered an actual injury, as was the case in *Hogue*; however, prospective releases, as opposed to settlements, are premised on the contrary notion. The majority of employees will receive benefits despite suffering no injury, and since these benefits exceed the value of their ADEA suits, deducting money from a recovery that does not occur is no consolation. Moreover, *Hogue*'s statement that "it suffices that ... the sum paid shall be deducted from any award determined to be due to the injured employee" is not a legal conclusion or an attempt by the Court at a compromise result, but is instead mandated by the specific language of section 5 of FELA. *Id.* at 517 n. 5, 88 S.Ct. at 1152 n. 5 ("in any action brought against any such common carrier under ... this chapter, such common carrier may set off therein any sum it has contributed or paid ... to the injured employee ... on account of the injury or

7. Roughly, the company should offer benefits that approximate [the nuisance value of a groundless suit + (the average value. of a successful ADEA suit + the average likelihood of proving that an employee was illegally dis-

charged)]. Because ADEA suits can be lucrative (perhaps because all jurors can empathize with and envision growing old), even a small number of plausible ADEA claims can increase the value of the offered benefits significantly.

death for which said action was brought.") There is no guarantee that this *"Hogue* set-off" will·be applied in other areas. In *Soliman,* the district court stated, without deciding the outcome, only that "[defendant] is entitled to a determination of what portion, *if any,* of the benefits ... should be deducted from whatever award [plaintiff] receives." 869 F.Supp. at 70 (emphasis added).

Of course, where there is a legitimate claim of age discrimination, the calculus differs. But an employee who is terminated discriminatorily is no more or less able to tender back the consideration than a legitimately discharged employee. Again, the contrast with *Hogue* and FELA is clear: an employee in Hogue's position does have additional costs that result from the fact of his injury. Since the circumstances that gives rise to a FELA claim (physical injury, medical expenses, etc.) also create economic duress, applying the tender-back rule would be a hardship on the employee, so an exception is warranted. Thus, the doctrine would indeed "deter meritorious suits" in the *Hogue* situation, whereas applying the rule to prospective waivers would merely deter all suits, regardless of merit.

This circuit has endorsed the application of common law doctrines to waivers and releases. For instance, in *Shaheen v. B.F. Goodrich Co.,* 873 F.2d 105, 107 (6th Cir.1989), where we held that waiver of an employment discrimination claim was not void as against public policy,[8] we also noted that a court should examine waivers and releases "under normal contract principles," in the absence of overreaching or exploitation.

I would hold that a tender-back requirement is not barred by *Hogue,* and is instead

consonant with basic notions of fairness in contract law.[9] The OWBPA, while it specifically changed the common law rules regarding the adequacy of knowledge and consent for making a valid waiver, did not purport to affect the preexisting contract law concerning the effect of invalid waivers. In such a circumstance, with neither the statutory language nor legislative history indicating any desire to change that ancient and reasonable body of law, I would hold that the tender-back rule continues to obtain. However, because of the confusion in the state of the law, as evidenced by the conflicting rulings in this area, I would hold that plaintiffs should not be deemed to have affirmatively ratified their waiver by failing to return their compensation. Instead, now having full knowledge of the consequences, plaintiffs would be able to continue with their suits only if they return the compensation received for the very thing, the waiver, that they now claim was worthless.

**IV**

The judgment of the district court is therefore reversed in part and the case remanded with instructions to proceed in conformity with parts I and II of this opinion and with the judgment of the court.

NATHANIEL R. JONES, Circuit Judge, concurring in part.

I agree with Parts I and II of the Judge Boggs' opinion, but I disagree regarding the tender-back requirement in Part III. Under the circumstances in this case, I do not believe Plaintiffs are required to tender back the consideration they received as a precondition to bringing suit against the Defendants

---

**8.** We stated that "public policy weighs in favor of allowing voluntary settlement of Title VII disputes and releases of private rights under the ADEA." *Shaheen,* 873 F.2d at 107. I find nothing to the contrary in the amendments to the OWBPA. In cases where there has been no discrimination and hence no "dispute," the worker receives a windfall, while the employer is purchasing certainty and finality, a valuable business and legal commodity.

**9.** In a case upholding the validity of a similar ADEA waiver (but pre-OWBPA), we noted:

> To set aside [plaintiff's] waiver in this case, after he had received enhanced benefits, may seem both inequitable and unfair. [He] is currently receiving additional benefits under the severance package, yet seeks to gain additional benefits of reemployment. If [he] were deemed entitled to be considered for reemployment, [defendant] might thereby be denied the benefit of its bargain. Some adjustment might therefore be appropriate in such a circumstance, if [plaintiff] were ultimately found entitled to reinstatement or to damages.

*Adams v. Philip Morris, Inc.,* 67 F.3d 580, 585 (6th Cir.1995).

under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, as amended by the Older Workers Benefit Protection Act ("OWBPA"), 29 U.S.C. § 626 *et seq.* The judgment of the district court on this issue will be affirmed.

The application of the "tender-back" doctrine in ADEA cases has created a split between the circuits. The Fourth and Fifth Circuits have applied the tender-back doctrine requiring plaintiffs to tender-back the consideration received before filing suit, while the Seventh and Eleventh Circuits have rejected a tender-back requirement. *Compare O'Shea v. Commercial Credit Corp.*, 930 F.2d 358 (4th Cir.1991), *cert. denied*, 502 U.S. 859, 112 S.Ct. 177, 116 L.Ed.2d 139 (1991), and *Wittorf v. Shell Oil Co.*, 37 F.3d 1151 (5th Cir.1994), *with Forbus v. Sears Roebuck & Company*, 958 F.2d 1036 (11th Cir.), *cert. denied*, 506 U.S. 955, 113 S.Ct. 412, 121 L.Ed.2d 336 (1992), and *Oberg v. Allied Van Lines, Inc.*, 11 F.3d 679 (7th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 2104, 128 L.Ed.2d 665 (1994). Judge Boggs' opinion, following the Fourth and Fifth Circuits, finds that a tender-back requirement is "consonant with basic notions of fairness in contract law." Boggs Op. at [1268]. Judge Boggs believes that if Plaintiffs retain compensation benefits, given pursuant to a severance agreement, they are precluded from filing suit under the ADEA. I disagree with this conclusion. Nor do I believe that the Plaintiffs ratified their severance agreements by continued retention of their benefits. I find the reasoning of the Seventh and Eleventh Circuits more persuasive and disagree with the proposition that Plaintiffs are required to tender back the compensation they have received.

In *Forbus v. Sears Roebuck & Company*, 958 F.2d 1036 (11th Cir.), *cert. denied*, 506 U.S. 955, 113 S.Ct. 412, 121 L.Ed.2d 336 (1992), the Eleventh Circuit held that retirees who brought suit under the ADEA were not required to return the consideration received for releases as a prerequisite to bring suit. *Id.* at 1041. The facts in *Forbus* are similar to those in this case. The plaintiffs were employees at a Sears Retail Distribution Center. *Id.* at 1038. Sears informed

the plaintiffs that the distribution center would be converting into a smaller retail center and would be reducing the number of jobs available. *Id.* The plaintiffs were offered a voluntary severance package, which they each accepted. *Id.* Acceptance of the package required the signing of a release and waiver of any claims against Sears. *Id.* The court held that the retention of the severance benefits did not constitute ratification of the releases. *Id.* at 1041. In *Oberg v. Allied Van Lines, Inc.*, 11 F.3d 679 (7th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 2104, 128 L.Ed.2d 665 (1994), the Seventh Circuit followed the reasoning in *Forbus* and held that former employees could not ratify their severance agreements by retaining the benefits received from Allied. *Id.* at 683. On similar facts, the court found the reasoning in *Forbus* compelling and rejected a tender-back requirement.

Both *Forbus* and *Oberg* rejected the notion that Plaintiffs must tender back severance benefits prior to maintaining a suit under the ADEA. Both circuits relied heavily on the Supreme Court decision in *Hogue v. Southern Ry.*, 390 U.S. 516, 88 S.Ct. 1150, 20 L.Ed.2d 73 (1968). While *Hogue* did not involve ADEA claims, it is clearly analogous to the ADEA situation.

At issue in *Hogue* was whether petitioner was required to tender back payments received prior to the bringing of suit under the Federal Employers' Liability Act ("FELA"), 45 U.S.C. § 51 *et seq. Id.* at 518, 88 S.Ct. at 1152. Holding that no such requirement existed, the Court argued that to require the return of benefits would be "wholly incongruous with the general policy of the Act to give railroad employees a right to recover just compensation for injuries negligently inflicted by their employers." *Id.* (quoting *Dice v. Akron, C. & Y.R. Co.*, 342 U.S. 359, 362, 72 S.Ct. 312, 314–15, 96 L.Ed. 398 (1952)).

Other courts have applied *Hogue* to bar tender prerequisites in lawsuits involving federal statutes other than the FELA. *See, e.g., Smith v. Pinell*, 597 F.2d 994, 996 (5th Cir.1979) (barring a tender requirement pursuant to the Jones Act); *Wahsner v. American Motors Sales Corp.*, 597 F.Supp. 991, 998 (E.D.Pa.1984) (holding that there is no ten-

der-back requirement in a case involving the Automobile Dealers' Day in Court Act). These cases show that the application of the *Hogue* decision is not limited to the FELA context, and its denial of the tender-back requirement can legitimately be extended to other remedial statutes. The *Hogue* decision is the only time the Supreme Court has spoken on the issue of tender-back prerequisites and should be followed by this court.

■ *Hogue* may be extended logically to ADEA claims. Both statutes are designed to make employees whole again from injuries received, whether physical or emotional, during the course of employment. I disagree with Judge Boggs' reasoning that *Hogue* is inapplicable to the instant case because under the facts of *Hogue* the injury was not in doubt. Boggs Op. at [1267]. Judge Boggs precludes applying *Hogue* in the present case because the injury was not clearly established. The fact that injury is not clearly established, as is the case under the FELA, is not reason enough to hold that *Hogue* is not analogous. There is no doubt but that the *Hogue* decision is applicable to the instant case. Accordingly, Plaintiffs should not be barred from suit by a tender-back requirement. The consideration Plaintiffs received is not a bar to suit but should instead be considered as an affirmative defense once a suit is filed. *Isaacs v. Caterpillar, Inc.*, 765 F.Supp. 1359, 1371 (C.D.Ill.1991). Defendants have a right to argue that the signing of the release agreement bars plaintiffs' claim of age discrimination, but this is something that should be argued once suit is brought.

Further, to require Plaintiffs to tender back benefits would be inequitable. A tender-back requirement would deter meritorious ADEA filings. Potential Plaintiffs would be faced with the Hobsonian choice of releasing their claims and receiving payments immediately or filing an age discrimination claim that would likely take years to resolve. It is doubtful that few claimants would choose the latter. If Plaintiffs had already received release consideration they would have to recover any amounts spent before they could bring a claim. This would bar Plaintiffs from litigating their age discrimina-tion claims in court. Rather than a bar to suit, a release should be considered as a factor that would reduce the judgment amount received by a plaintiff upon bringing suit. I find the reasoning of the district court compelling:

> It would be inequitable and contrary to the protective nature of the OWBPA to require plaintiffs to tender back the consideration received in exchange for executing waivers where the waivers were obtained without compliance with the OWBPA. Furthermore, it would deter meritorious challenges to releases. Workers who are forced out in an involuntary termination "are unlikely to be able to put their severance payments aside for future 'tenders' or to be able to come up with the money to make such a tender at such later time as they acquire grounds to believe that a successful lawsuit might be mounted in connection with their retirements."

*Memorandum and Order of Aug. 1, 1994 at 21* (quoting *Isaacs v. Caterpillar, Inc.*, 765 F.Supp. 1359, 1367 (C.D.Ill.1991)).

Requiring that release amounts be subtracted from judgment amounts would be a more equitable remedy than forcing potential claimants to tender back benefits prior to bringing suit. Plaintiffs would not be earning a windfall by being able to retain their benefits and receive a judgment amount as well, and employers would not be penalized twice for the same actions because any money already received could be subtracted by the fact-finder before awarding final damages.

Additionally, a tender-back requirement would contradict the concerns that Congress evidenced in enacting the OWBPA. Congress established the OWBPA because of its concern that employees may waive their rights prior to becoming aware that they are entitled to legal and equitable relief.

> The Committee's [Committee on Education and Labor] major concern in this regard is that early retirees or employees ... can be forced to waive their right to file a claim when the employer conditions such participation on the signing of a waiver.... The preemptive waiver of rights occurs before a dispute has arisen and indeed

before an employee is even aware of any potential or actual pattern of discrimination. Such a preemptive waiver also may preclude the employee from asserting claims that arise out of subsequent discriminatory conduct by the employer, e.g., hiring younger workers to replace the terminated older workers. These waivers are both unfair and inconsistent with the intent of the ADEA.

H. Rep. No. 101–664, 101st Cong., 2d Sess. 22–23 (1990), U.S.Code Cong. & Admin.News 1990, p. 1509. It was the intent of Congress that waivers would not preclude parties from bringing suit under the OWBPA. To require a tender-back requirement is an effective bar to suit and as such, it is incongruous with the intent of the OWBPA.

For the forgoing reasons, the judgment of the district court will be affirmed on this issue.

RALPH B. GUY, Jr., Circuit Judge, concurring in part and dissenting in part.

I concur with Parts I and II of Judge Boggs's opinion, but I concur in the result only reached by Judge Jones on the tender-back issue discussed in Part III of Judge Boggs's opinion, limiting my concurrence to the facts of this case.

On the tender-back issue, I would only add that there was not a total failure of consideration when the ADEA claim was instituted without plaintiffs tendering back benefits received. The release signed was a general one, releasing the employer from any and all claims, not just ADEA claims. The general release is still valid, and it is only that portion of the release involving ADEA claims that is called into question by this lawsuit. I reserve judgment as to whether a release limited to ADEA claims would require a different result.